IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LACOYIA MARIE CAMPBELL, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MARTIN O'MALLEY | : | No. 21-cv-4166 |
| | : | |

**MEMORANDUM OPINION**

**CRAIG M. STRAW**                                                    **March 26, 2024**
**United States Magistrate Judge**

  Lacoyia Marie Campbell seeks review of the Commissioner's decision denying her applications for Supplemental Social Security (SSI) and Disability Insurance Benefits (DIB). Doc. 10, at 1. The matter was referred to me[1] on consent of the parties.[2] For the following reasons, I deny Campbell's request for review and affirm the Commissioner's decision.

## I. PROCEDURAL HISTORY

  On August 8, 2019, Campbell filed applications for DIB and SSI benefits under Titles II and XVI of the Social Security Act. R.17; 228; 235. In both applications, Campbell alleged she became disabled on September 24, 2017. R.17; 285. These claims were denied initially on January 16, 2020, and then again on reconsideration on August 3, 2020. R. 17; 135-39; 144. Campbell filed a written request for a hearing. R. 17; 151-52. Due to the COVID-19 Pandemic, the Administrative Law Judge (ALJ) held a telephone hearing on December 17, 2020. R. 17; 44; 221-22. Campbell was represented by counsel. R. 45. At the hearing, counsel moved to amend

---

[1] I was reassigned the case from Magistrate Judge David R. Strawbridge on July 27, 2023. Doc. 18.

[2] See Doc. 20; 8 U.S.C. § 636(c) & Rule 73, Fed. R. Civ. P.

the alleged onset date to July 25, 2019, and the motion was granted.  R. 49-52.  Vocational

Expert (VE) Daniel Rappucci testified at the hearing.  R. 17; 44.

The ALJ issued a written decision denying benefits on January 21, 2021.  R. 36.

Campbell filed a request for review of the ALJ's decision, which was denied.  R. 1-3; 13; 223-

25.  Thus, the ALJ's decision became the final decision of the Commissioner of Social Security.

R. 1-3; 20 C.F.R. §§ 404.981, 416.1481.  Campbell's counsel then brought this action in federal

court.  Doc. 1.  Campbell filed a Brief and Statement of Issues in Support of Request for Review.

Doc. 10.  Defendant filed a Response to Request for Review of Plaintiff.  Doc. 11.  Campbell

filed a Reply Brief in Support of Request for Judicial Review.  Doc. 17.

## II.   <u>LEGAL STANDARDS</u>

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of not less

than 12 months . . . ."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step sequential

process to determine if a claimant is disabled, evaluating:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. If not, whether the claimant has a "severe impairment" that significantly limits their physical or mental ability to perform basic work activities;

3. If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings," <u>see</u> 20 C.F.R. pt. 404, subpt. P, app. 1), which results in a presumption of disability;

4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the Residual Functional Capacity (RFC) to perform their past work; and

> 5.   If the claimant cannot perform their past work, whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014); see also 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant can perform other jobs in the local and national economies in light of their age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007) (citation omitted).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  See 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" and must be "more than a mere scintilla but may be somewhat less than a preponderance of the evidence."  Zirnsak, 777 F.3d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (explaining substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (additional citations omitted)). It is a deferential standard of review.  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (citing Schaudeck, 181 F.3d at 431).

## III.   ALJ'S DECISION AND PLAINTIFF'S REQUEST FOR REVIEW

The ALJ determined that Campbell had not engaged in substantial gainful activity since July 25, 2019.  R.19.  The ALJ found that Campbell had several severe impairments including syncope, anxiety, panic disorder, and depression.  R. 20; see also 20 C.F.R. §§ 404.1520(c), 416.920(c).  These impairments or combination of impairments did not, however, meet or

medically equal the severity of one of the Listings.  R. 20-21; 20 C.F.R. pt. 404, subpt. P, app. 1; see also 20 C.F.R. §§ 416.920(d), 416.925, & 416.926.  When evaluating Campbell's mental impairments pursuant to the "paragraph B" criteria, the ALJ found that Campbell had mild limitations interacting with others and understanding, remembering, or applying information.  R. 22.  Campbell had moderate limitations concentrating, persisting, or maintaining pace and adapting or managing herself.  R. 22-23.  Consequently, the ALJ determined that Campbell's mental impairments did not satisfy the "paragraph B" criteria.[3]  R. 23.  The ALJ also found that the evidence failed to establish the presence of the "paragraph C" criteria.[4]  Id.

Considering the entire record, the ALJ found that Campbell had the RFC to perform a full range of work at all exertional levels.  R. 24.  The ALJ, however, limited Campbell to performing simple, routine tasks at a consistent pace but not a production-rate pace where each task must be completed within a strict time deadline.  Id.  Campbell was further restricted to only occasional climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; and no exposure to driving vehicles, unprotected heights and moving machinery.  Id.  Campbell was also limited to work involving frequent interaction with supervisors, the general public, and with co-workers; low stress jobs, defined as requiring only occasional decision-making and changes in the work setting; and no work involving shared tasks with co-workers.  Id.

Campbell had no past relevant work.  R. 35; 20 C.F.R. §§ 404.1565, 416.965.  Relying on the testimony of VE Rappucci, the ALJ determined that based on Campbell's age, education,

---

[3] See 20 C.F.R. pt. 404, subpt. P, app. 1.
[4] See 20 C.F.R. pt. 404 subpt. P, app. 1, § 12.00(G)(2)(b)-(c).  Regarding the paragraph C criteria, the ALJ noted that Campbell had been capable of traveling out of state and maintaining a marriage, and that her care had been conservative, without referrals for higher level of care such as an intensive program or hospitalization.  R. 23.

work experience, and RFC, a significant number of jobs existed in the national economy she could perform including linen room attendant, electrical accessories assembler, and table worker. R. 35-36; see also 20 C.F.R. §§ 404.1566(b), 416.969, 416.969a.  Therefore, the ALJ found that Campbell was not disabled.  R. 36.

In her request for review, Campbell raises three issues.  First, Campbell asserts the ALJ erroneously rejected the opinion of her treating psychologist.  Doc. 10, at 4-13.  Next, Campbell contends the ALJ erroneously discounted the severity of Campbell's syncope symptoms.  Id. at 13-16.  Finally, Campbell argues the ALJ failed to include all of Campbell's credibly established limitations in her RFC and hypothetical questions to the VE.  Id. at 16-19.  The Commissioner counters stating substantial evidence supports the ALJ's findings regarding Campbell's treating psychologist, the severity of Campbell's symptoms, and her RFC.  Doc. 11, at 7-21.

## IV.   FACTUAL BACKGROUND

### A.  Medical opinions[5]

Campbell was twenty-five years old on the disability onset date and is therefore considered a "younger individual."  R. 35; 20 C.F.R. §§ 404.1563(c), 416.963(c).  Campbell suffers from syncope, panic disorder, anxiety, and depression.  R. 20; 461; 465; 643-58; 661; 666; 935-45.

Campbell reported that her first syncopal episode occurred on September 18, 2017.  R. 445.  From October 2017 to April 2018, Campbell had a normal neurology exam, stress and cognitive tests, and a generally normal echocardiogram.  R. 26; 378; 401; 429-38; 443-44.  She

---

[5] Two additional state agency consultants, Bettye Stanley, D.O., and Crescenzo Calise, PhD, assessed Campbell's physical limitations, but Campbell's physical limitations are not at issue here.

had a 24-hour Holter monitor test that did not correspond with significant findings (although Campbell reported several syncopal episodes); an abnormal tilt-table test consistent with cardio-depressor syncope; a brain MRI that showed diagnostic possibilities of migraines, vasculitis, Lyme disease, or demyelinating disease; and a normal EEG.[6] R. 26; 375-78; 439-42.  During that time period, Campbell reported syncopal episodes two to three times per day and memory problems.  R. 26; 435; 464; 470; 604.  Neither a beta blocker nor Florinef helped her symptoms. R. 26; 464; 600; 604.  In June 2018, Campbell's primary care provider attributed the syncopal episodes to anxiety and advised Campbell to avoid driving, to follow up with neuropsychiatry, and restart Paxil.  R. 27; 464.  Campbell elected not to take Paxil as she had previously taken it for seven years and had weaned herself off.  R. 464; 638.

By May 2019, Campbell reported that her syncopal episodes had improved to once per day.  R. 27, 657.  Campbell was reluctant to take any prescribed medication due to the side effects she had suffered in the past but would take Hydroxyzine as needed for anxiety and began taking Buspar beginning in July 2019.  R. 640-41; 644-45.  Campbell's primary care physician referred her to a psychologist, and she began weekly psychotherapy treatments with Dr. Robin Beaumont, PhD, in June 2019.  R. 954-1044.  In March 2020, Christine Marshall, MD, prescribed Campbell Lexapro to replace her Buspar prescription.  R. 680-81.

Dr. Beaumont provided a medical report in November 2019.  R. 661-62.  She diagnosed Campbell with panic disorder and noted that Campbell experienced panic attacks and daily anxiety, along with sudden losses of consciousness approximately twice per day.  R. 661-62;

---

[6] According to the administering physician, Jessica Feldman, MD, Campbell experienced one instance of head slumping and eye fluttering during the EEG.  However, there was no measurable epileptiform correlate to this.  R. 439

6

955; 971.  Dr. Beaumont reported that Campbell's symptoms "significantly impact[] her ability to engage in typical daily life activities such as going to the grocery store, attending doctor appointments independently, and employment."  R. 661.  In July 2020, Dr. Beaumont reported a change in Campbell's symptoms.  R. 840.  Campbell began behaving in an agitated manner prior to an episode, where she described "run[ning] out of her home, and [being] unable to identify familiar people who are with her during the episode."  R. 31; 840.

In October 2020, Dr. Beaumont provided another medical source statement (MSS), stating that Campbell had "no useful ability to function" in the following areas: remembering work-like procedures; maintaining a routine without supervision; working without interruptions from symptoms; performing without unreasonable rest periods; and accepting instructions and responding appropriately to criticism from supervisors.  R. 34; 927.  In the same assessment, Dr. Beaumont stated that Campbell was "unable to meet competitive standards" in the following areas: understanding and remembering simple instructions; making simple work-related decisions; asking questions or requesting assistance; maintaining attention and regular attendance; working with others without being distracted or distracting them; interacting appropriately with the public; responding appropriately to changes in routine or normal work stress; being aware of hazards and taking precautions; and adhering to standards of neatness and cleanliness.  Id.  Dr. Beaumont reported that Campbell lost consciousness two to five times daily and was "unable to focus, make decisions, interact with the public/customers for a period of 30-45 minutes before or after losing consciousness."  R. 928.  Campbell "had difficulty word finding, problem solving, lethargy[,] and confusion for extended periods, [90 minutes or more] a day, [two to five times] a day."  Id.  Dr. Beaumont opined that Campbell would be absent more

than three days per month.  R. 34; 928.  Dr. Beaumont noted that "changes in routine [or] environment, such as working with customers or interacting with coworkers heightens [her] anxiety which increases the frequency of her [syncope]."  R. 929.

Dr. Debra Mashberg, a consultive examiner, conducted a mental status evaluation of Campbell in December 2019.  R. 663-74.  Dr. Mashberg diagnosed Campbell with panic disorder and generalized anxiety disorder.  R. 28; 666.  Dr. Mashberg opined that Campbell had no limitations understanding, remembering, or carrying out simple or complex instructions, making judgments on simple or complex work-related decisions, interacting appropriately with the public, supervisors, or coworkers, or responding appropriately to usual work situations or changes in a routine work setting.  R. 32; 668-69.

In December 2019, Melissa Franks, Psy. D., a state psychological consultant, also evaluated the evidence of record and determined that Campbell had mild limitations understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing herself.  R. 85.

In July 2020, state psychological consultant Anthony Galdieri, PhD, reviewed the evidence of record and opined that Campbell had mild limitations understanding, remembering, or applying information, and adapting or managing herself.  R. 121.  She had moderate limitations interacting with others and concentrating, persisting, and maintaining pace.  Id.

### B.  Non-medical evidence

Campbell has completed one year of college.  R. 265.  She has no past relevant work but previously worked as a cashier and barista.  R. 35; 265.  Campbell outlined her health issues and limitations at the hearing.  R. 53-57.  She testified that she passes out two to five times a day and

is tired, dizzy, and nauseous throughout the day.  R. 53.  Additionally, she testified that she has memory problems, headaches, and low energy.  R. 54, 57.  Although treatment has helped her anxiety and panic attacks, she reported her syncopal episodes have not improved.  R. 54.  Campbell was unable to attend recent telehealth appointments with her therapist due to exhaustion and her episodes.  R. 56.

Campbell lives with her husband in a mobile home and is unable to drive.  R. 57-58.  After the disability onset date, Campbell travelled to Disney World with her family for six days.  R. 58.  She went to the park but was not able to walk for long periods of time and spent 30-40% of the trip in her room.  R. 58; 67.  She remains at home alone three or four days per week, but occasionally her mother-in-law or sister visit.  R. 60.  Campbell testified that most days she is in bed or on the couch, but on a "good day" she can do small housework tasks like sweeping or cleaning up after her cats.  Id.  She testified that beginning in May or June 2020, after waking up from an episode she is in a "fight or flight response" and cannot remember what happened during the episode.  R. 65.  Campbell also experiences night terrors.  Id.  She cannot bathe alone, and her husband must supervise her in case of a syncopal episode.  R. 66.  She stopped attending college because she could not concentrate on reading and would pass out.  R. 67-68.  While Campbell worked as a cashier in 2019, her employer allowed her to call out of work two to three times per month and tried creating a safer work environment by installing cameras to check on her while working.  R. 69-70.

Spencer Campbell, Campbell's husband, completed a Third-Party Function Report in October 2019.  R. 315.  He claimed that his wife passes out multiple times per day and after is fatigued and confused.  Id.  He also stated she cannot work alone or drive, cannot bathe alone,

and sometimes struggles dressing herself.  R. 316.  Campbell can feed the cats, change the litter box sometimes, and do the dishes and laundry, but these chores take her longer than average.  R. 316-17.  She also can play video games and hang out with friends or family once or twice a week as long as she does not get fatigued.  R. 319.  Mr. Campbell's December 2020 statement reports that Campbell has passed out unpredictably for the last three years.  R. 367.  On average, her syncopal episodes are two to five minutes and occur twice daily.  Id.  However, on "bad days," she could pass out up to ten times daily.  Id.  She is unable to do chores that require her to stand and has been unable to keep a job.  Id.  She has suffered anxiety attacks, memory problems, and has difficulty focusing.  Id.  He mentioned that she dropped out of college because of these issues.  Id.

Campbell's former employer, Kirstin Nice, owner of M&J Gourmet, also submitted a letter in October 2020.  R. 346.  Ms. Nice stated that she was aware of Campbell's limitations when she hired her in January 2019 and worked to ensure her safety.  Id.  She reported that Campbell lost consciousness while working several times and that her illness prevented her from performing the job safely.  Id.  She noted that Campbell was "upstanding, honest, and [a] hard worker."  Id.  Campbell quit her job with M&J Gourmet due to her symptoms.  R. 27; 643; 969.

## V.    DISCUSSION

### A.  The ALJ properly evaluated and considered the opinion of Campbell's treating psychologist, Dr. Beaumont, and the decision is supported by substantial evidence.

Campbell's first general claim is that the ALJ erroneously rejected the opinion of Dr. Beaumont as unsupported by objective medical evidence and inconsistent with the record.  Doc. 10, at 9-10.

10

When considering medical evidence, the ALJ will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a).  The ALJ instead assesses the persuasiveness of a medical opinion by evaluating several factors including supportability, consistency, the medical source's relationship with the claimant, the source's specialization, and the source's familiarity with other evidence in the claim or understanding of the disability program's policies and evidentiary requirements.  Id.  When determining whether a medical opinion is persuasive, the most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a); 404.1520c(c); 416.920c(a); 416.920c(a).

The ALJ is not required to explain all factors, but the ALJ must explain how she considered supportability and consistency.  20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2).  Supportability considers how relevant "the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)."  20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1).  Consistency is the measure of how consistent "a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim."  20 C.F.R. §§ 404.1520c(c)(2); 416.920c(c)(2).  The ALJ may choose which opinions to credit, but "cannot reject evidence for no reason or for the wrong reason."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).  In rejecting a medical opinion, the ALJ must describe why the evidence was rejected and "explain [any] conciliations and rejections."  Burnett, 220 F.3d at 122.

Here, the ALJ found the opinion of Campbell's treating psychologist, Dr. Beaumont, was

unpersuasive.  R. 34.  The ALJ discussed Dr. Beaumont's November 2019 and July 2020

reports:

> Dr. Beaumont's description of the claimant's limitations is not
> supported by her own treatment records. She has not reported on any
> observed episodes of lost consciousness and has treated the claimant
> with conservative psychotherapy. She has not reported any observed
> episodes of agitation or panic. Her observations of the claimant only
> mention disturbances in mood and affect and note she was "variably
> impaired" in functional status; however, she also notes the claimant
> is oriented, alert, and interactive and does not explain her finding of
> functional status. Treatment notes also indicate the claimant was
> capable of traveling, of functioning alone prior to June 2020, and of
> maintaining a relationship. Treatment notes further show the
> claimant reported recognizing some patterns to her episodes that are
> not described in Dr. Beaumont's report. Additionally, the
> longitudinal evidence supports only conservative medical care since
> the amended onset date, with no neurological, psychiatric, or
> neuropsychiatric follow up despite recommendations to engage in
> such care.

R. 32 (internal citations omitted).  The ALJ decision also addresses Dr. Beaumont's December

2020 MSS, providing:

> Dr. Beaumont's limitations are unsupported by the claimant's
> mental status examination, which showed good attention and
> concentration and appropriate interview behavior; none of her
> subsequent progress notes show objective abnormalities to support
> such severe limitations. The limitations are similarly inconsistent
> with the evidence of record; the claimant remained capable of
> engaging in part-time work through July 2019, at which point she
> quit. This suggests she was capable, even if limited, of performing
> work-related activities. Additionally, Dr. Beaumont's reports on the
> claimant's episodes are not supported by observation; she has not
> reported direct observation of the claimant's symptoms during
> appointments in 2019 or 2020. This suggests the limitations assessed
> are heavily based on self-report.

R. 34 (internal citations omitted).

12

Campbell first claims that the ALJ erred when she found Dr. Beaumont's opinion unsupported by objective medical evidence.  To this point, Campbell argues that Dr. Beaumont "specifically supported her opinions with detailed explanations, and made objective clinical findings of anxious mood and labile affect based on her observations at multiple therapy sessions."  Doc. 10, at 9-10.  Campbell also argues that the ALJ improperly characterized Campbell's treatment as conservative when she dismissed Dr. Beaumont's opinion as unsupported.  Doc. 17, at 3.

Here, the ALJ analyzed Dr. Beaumont's treatment records and the supportability of those records.  Specifically, the ALJ considered that Dr. Beaumont herself had never witnessed an episode of syncope, panic, or agitation.  R. 32; 932-53; 967-1044.  While true that Dr. Beaumont repeatedly recorded Campbell's complaints regarding syncopal episodes within her treatment notes, recording a claimant's subjective complaints within a medical report does not transform a claimant's symptom into a supported opinion.  See Lisowicz v. Barnhart, 47 F. App'x. 629, 632 (3d Cir. 2002) ("the ALJ is not required to give Plaintiff's self-reported symptoms controlling weight simply by virtue of their reproduction in her treating physician's report").  This remains true even where—as here—there are a substantial number of such complaints.  Rodriguez v. Barnhart, No. 04-5375, 2005 U.S. Dist. LEXIS 20166, at *25 (E.D. Pa. Sep. 14, 2005) (finding that "sheer quantity" of subjective complaints does not change their character).  Because Dr. Beaumont never directly observed any of Campbell's syncopal episodes, but instead relied on Campbell's subjective reports, her opinion does not constitute a supported medical opinion entitled to controlling weight.  Lisowicz, 47 F. App'x. at 632.  The ALJ also considered that Dr. Beaumont's treatment records repeatedly indicated that Campell was "variably impaired" in

functional status, while also consistently describing Campbell as "fully oriented, alert, and

interactive."  R. 32; 34; 932-1042.  Dr. Beaumont does not explain Campbell's functional status

or this discrepancy, making her opinion unsupported.  R. 32; See Salles v. Commr. Of Soc. Sec.,

229 F. App'x. 140, 148 (3d Cir. 2007) ("A lack of evidentiary support in the medical record is a

legitimate reason for excluding claimed limitations from the RFC.")  Therefore, the ALJ

properly discounted Dr. Beaumont's opinion on that ground.

     The ALJ also noted Campbell's conservative psychotherapy treatment did not support Dr.

Beaumont's opinion of Campbell's debilitating limitations.  R. 32; 932-53; 967-1044.  When

present, conservative treatment tends to "'discredit[ ]' the severity of the claimant's 'subjective

symptoms.'"  Becker v. Kijakazi, No. 20-cv-5806, 2022 U.S. Dist. LEXIS 69705, at *n.5 (E.D.

Pa. Apr. 14, 2022) (citing Morales v. Comm'r of Soc. Sec., 799 F. App'x 672, 676-77 (11th Cir.

2020).  "[T]here is no bright-line rule for what constitutes 'conservative' versus 'radical'

treatment," and courts within this Circuit have allowed ALJs to make this determination if

accompanied by adequate explanation.  Robert M. v. Kijakazi, No. 22-cv-1476, 2023 WL

5839299, at *9 (M.D. Pa. Aug. 7, 2023), approved and adopted, No. 22-cv-1476, 2023 WL

5628604 (M.D. Pa. Aug. 31, 2023); see, e.g., Christina L. v. Kijakazi, No. 22-cv-521, 2023 U.S.

Dist. LEXIS 156341, at *18-19 (M.D. Pa. July 24, 2023) (finding that ALJ's characterization of

conservative treatment was not supported because ALJ failed to discuss and analyze treatment

modalities that Plaintiff pursued); Gonzalez v. Saul, No. 18-8937, 2019 U.S. Dist. LEXIS

223585, at *19 (D.N.J. Nov. 13, 2019) (finding ALJ properly labeled claimant's treatment

history conservative because ALJ discussed claimant's psychotherapy treatment and medication

management).

Here, Campbell's treatment consisted of weekly therapy sessions focused on identifying signs of increasing anxiety and de-escalation skills to prevent panic attacks and prescriptions for Buspar or Lexapro and Hydroxyzine.  R. 32, 932-53, 967-1044.  This treatment can reasonably be described as conservative.  See Gonzalez v. Saul, No. 18-8937, 2019 U.S. Dist. LEXIS 223585, at *19 (D.N.J. Nov. 13, 2019) (acknowledging that twice monthly psychotherapy and monthly medication management "can reasonably be described as [conservative]"); see also Rivera v. Berryhill, No. 16-4106, 2017 U.S. Dist. LEXIS 170752, at *16-17 (D.N.J. Oct. 13, 2017) (finding that treatment with medication and monthly psychotherapy was "conservative" treatment).  Therefore, the ALJ properly classified and considered Campbell's conservative treatment when determining that Dr. Beaumont's opinion is unsupported by objective medical evidence.

Next, Campbell claims that the ALJ erred when she found Dr. Beaumont's opinion inconsistent with the record.  Campbell argues that she quit her part-time job because she was unable to perform it safely due to syncopal episodes, which is entirely consistent with Dr. Beaumont's limitations.  Doc. 10, at 10-11; R. 346.  In support of this argument, Campbell asserts that "even if Plaintiff had successfully performed this part-time job, it would not be dispositive of her ability to perform a job on a full-time, regular and continuing basis, which is the regulatory standard for disability at Step Five of the sequential evaluation."  Doc. 17, at 2.

Campbell is correct that part-time work is not definitive proof of the ability to work full time.  But the ALJ did not cite Campbell's part-time work as evidence that she is able to work

full-time or as evidence of her abilities when determining her RFC.[7]  Instead, the ALJ considered Campbell's part-time work as a factor when she evaluated Dr. Beaumont's opinion.  See Leventhal v. Kijakazi, No. 20-cv-3157, 2021 WL 5163202, at *9 (E.D. Pa. Nov. 5, 2021) (permitting ALJ to consider Plaintiff's ability to engage in childcare and part-time work as evidence inconsistent with restrictive limitations provided by Plaintiff's physician, but not as evidence of Plaintiff's ability to work full-time). Campbell's ability to engage in any consistent work (even though it is accommodated) is inconsistent with Dr. Beaumont's opinion that Campbell has severe limitations.

The ALJ also found that Dr. Beaumont's proposed restrictions were inconsistent with Campbell's daily activities.  While the ALJ included this reasoning in her supportability analysis, it also concerns the consistency of Dr. Beaumont's opinion with non-medical sources in the record, specifically Campbell's self-reported activities.  Although helpful to the Court's review, the ALJ is not required to explicitly mention supportability and consistency when analyzing these factors.  See Kaschak v. Kijakazi, No. 21-354-E, 2023 U.S. Dist. LEXIS 36326, at *n.2 (W.D. Pa. Mar. 3, 2023) (noting "there are no 'magic words' an ALJ must use to articulate his or her consideration of supportability and consistency") (citing Cooper v. Comm'r of Soc. Sec., 563

---

[7]  The ALJ may consider evidence before the Plaintiff's onset disability date when Plaintiff's reported symptoms appear similar in severity during this time.  See Payne v. Kijakazi, No. 21-cv-5635, 2023 U.S. Dist. LEXIS 105975, at *n.2 (E.D. Pa. June 20, 2023) (permitting ALJ to consider Plaintiff's ability to work until onset disability date when assessing consistency of physician's opinion where "Plaintiff [does not] alleg[e] disability based on an injury that occurred on a particular date"); see also Cassler v. Colvin, No. 12-5015, 2014 U.S. Dist. LEXIS 121147, at *3 n.5 (E.D. Pa. May 14, 2014) (denying Commissioner's argument that "any evidence pertaining to the period of time before the alleged onset date…is irrelevant" because Plaintiff "has not alleged disability based on an injury that occurred on a particular date").

F. App'x. 904, 911 (3d Cir. 2014)).  In this vein, discussing this evidence within the context of supportability does not preclude considering it as evidence of inconsistency.

During the time Dr. Beaumont alleged Campbell experienced extreme limitations, after her disability on set date, Campbell travelled to Disney for six days with her family.  R. 32; 58; 941.  Campbell reported that she was able to cook, prepare food, clean, do laundry, and go shopping if accompanied.  R. 32; 304-07.  Campbell also appeared to spend much of her time alone until she decided in June 2020 that she wanted someone with her 24 hours a day.  R. 32; 1036.  Campbell's actions are inconsistent with Dr. Beaumont's opinion that Campbell's symptoms "significantly impacted her ability to engage in typical daily life activities" because Campbell was not as limited as Dr. Beaumont suggested.  R. 31; 661.  The ALJ sufficiently explained why she discounted Dr. Beaumont's opinion on this basis, and her decision is supported by substantial evidence.  Campbell's first claim regarding Dr. Beaumont fails.

### B.  Substantial Evidence Supports the ALJ's Assessment of the Severity of Campbell's Syncope in her RFC.

Campbell next maintains that the ALJ did not have substantial evidence to discount the severity of Campbell's syncope symptoms  in her RFC.  Doc. 10, at 13-16.

A two-step process is used to evaluate a claimant's symptoms in disability claims.  Social Security Ruling 16-3P: Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2016 WL 1119029, at *3, *4 (S.S.A. Mar. 16, 2016).  First, it is determined whether a claimant has "a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms."  Id. at *3.  Second, the ALJ evaluates the intensity and persistence of an individual's symptoms such as pain and determines the extent to which the symptoms limit the claimant's ability to perform work-related activities.  Id. at *4-5.  At the

second step, in addition to the objective medical evidence in the record, the ALJ considers factors relevant to the claimant's symptoms including (1) daily activities; (2) location, duration, and frequency of pain and other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness and side effects of medication; (5) treatment, other than medication; (6) other measures taken to relieve pain; and (7) other factors.  See 20 C.F.R. § 404.1529I(3)(i)–(vii).

It is true that the ALJ is required to give "serious consideration to a claimant's subjective complaints of pain [or other symptoms], even where those complaints are not supported by objective evidence.'"  Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985)).  Nevertheless, subjective complaints alone are not sufficient to establish a claimant's disability.  See 20 C.F.R. §§ 404.1529(a); 416.929(a).  When considering the credibility of the complaints in light of the objective medical evidence, the ALJ may partially or entirely reject complaints that are inconsistent with the evidence.  Id.; see also Weber v. Massanari, 156 F. Supp. 2d 475, 485 (E.D. Pa. 2001).  Moreover, when a claimant's daily activities are inconsistent, an ALJ may "conclude that some or all of the claimant's testimony about her limitations or symptoms is less than fully credible."  Burns, 312 F.3d at 129–30 (3d Cir. 2002).  An ALJ's conclusion regarding a claimant's subjective complaints of pain is entitled to great deference, and the decision will be upheld as long as substantial evidence supports the conclusion.  See Biestek, 139 S. Ct. at 1157; Horodenski v. Comm'r of Soc. Sec., 215 F. App'x 183, 189 (3d Cir. 2007); see also Cosme v. Comm'r of Soc. Sec., 845 F. App'x 128, 133-34 (3d Cir. 2021) (holding substantial evidence, including opinions of medical doctors, supported ALJ's decision to discount claimant's subjective complaints).

An RFC assessment is the most a claimant can do in a work setting despite the limitations caused by his or her impairments.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  An ALJ is required to include in the RFC any credibly established limitations supported by the record.  Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 147 (3d Cir. 2007).  The ALJ's RFC assessment must be "'accompanied by a clear and satisfactory explication of the basis on which it rests.'"  Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001) (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).  Once an ALJ has made an RFC determination, the RFC assessment will not be set aside if it is supported by substantial evidence.  Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002).

The ALJ considered Campbell's statements about the intensity, persistence and limiting effects of her symptoms and their impact on Campbell's ability to perform work-related activities, finding them inconsistent with the record evidence.  R. 29-30.  The ALJ noted various inconsistencies between Campbell's testimony and the record:

> The claimant's specialist testing predates her amended onset date; she saw neurology and cardiology in 2017 and 2018 but did not engage in follow up after initial testing was generally negative. Despite neurology advising her to follow up both with neuropsychiatry and with neurology after April 2018, records show no engagement with a neuropsychiatrist and no neurology follow up since her amended onset date. Records indicate she lost her insurance and was unable to follow up with neuropsychiatry in early 2020, but later records only mention concerns about being evaluated. Regardless, the claimant has not undergone formal evaluations with autonomic or neuropsychiatric specialists, despite recommendations to engage. The claimant was also resistant to using medication, though it was recommended; the claimant's primary care provider indicated she should restart Paxil, but she was hesitant. Again in March 2020, she told another primary care provider she was unwilling to go back on anti-depressants. Additionally, the claimant's reports of her episodes vary during her alleged disability period. She testified she passes out two to five

> times a day during her December 2020 hearing, but she reported in her Statement it was an average of twice per day. In October 2019, she told one provider it had improved from occurring once to three times per day to only occurring once; she told another provider in March 2020 it was occurring multiple times per day. Though she reported in her Statement and testimony there were no known triggers or times of day, she reported to her psychologist the episodes generally happened in the late afternoons and in the evenings; she also mentioned exercise or her menstrual cycles were triggers; and she repeatedly acknowledged the episodes were related to increased anxiety. The claimant alleged she felt unsafe because of the episodes and could not be alone; however, the evidence suggests she spent much of her time alone until she indicated she wanted someone with her 24 hours a day in June 2020. She reported she had been to the emergency room because of symptoms, but there are no emergency room visits since April 2019. There is also no indication the claimant suffered any injuries as a result of losing consciousness; she has not reported falls, and she acknowledged the syncope generally affected her while sitting and lying down. Records also suggest she had been advised of a vascular technique to stop the cycle of passing out; however, she told her psychotherapist in August 2020 she had not tried the technique. The claimant also reported variably on activities of daily living; she told Dr. Mashberg she could cook, do cleaning and laundry, and shop with someone else.  During testimony, however, she noted she could only tidy or sweep on a good day and otherwise was in bed or on the couch. These inconsistencies suggest the information provided by the claimant may not be entirely reliable.

Id. (internal citations omitted).  The ALJ also found that Campbell's statements about the

severity of her symptoms were inconsistent with the medical evidence, which showed

conservative treatment and few objective signs of limitations:

> Mental status examinations have observed anxious mood and anxious or labile affect. Her therapist noted she was "variably impaired" in functional status; however, she repeatedly noted the claimant was oriented, alert, and interactive via telehealth appointments. The claimant has also demonstrated intact cognition, memory, attention and concentration. The undersigned recognizes the claimant's stress and anxiety affect her physical symptoms, but both her medical and mental health care since her amended onset date have been conservative. She has declined psychiatric

medication, psychiatric care, and neuropsychiatric care. Her physical and mental examinations have been generally benign except for changes in mood and affect. She has reported symptoms of depression to her therapist that she has otherwise denied to other providers, but she has not been referred to a higher level of care. She has also retained the abilities to engage in activities of daily living including traveling, socializing, using online social media, preparing meals, engaging in hobbies, exercising, and maintaining a relationship despite her limitations. She told a provider in late 2020 she was engaging in work involving more time standing; even though she clarified this was housework at the hearing, she did not mention episodes of syncope during September or October 2020 primary care appointments.

R. 29-30.

Campbell argues that the ALJ violated the Social Security regulations by rejecting the severity of her symptoms detailed at the hearing and in her husband's written statements. Doc. 10, at 14. She also argues that the ALJ did not consider all of the objective medical evidence, namely medical opinions from Joseph Perez, D.O., and Tina Myers, D.O. Id. at 15.

The ALJ properly considered Campbell's subjective complaints. The ALJ followed the two-step process and determined that Campbell's medically determinable impairments could reasonably be expected to cause Campbell's alleged symptoms. R. 26. Contrary to Campbell's argument, lack of objective evidence was not the only factor the ALJ considered in assessing Campbell's subjective reports. Doc. 10, at 14; R. 26-28. Instead, the ALJ correctly discredited Campbell's testimony given the inconsistencies in her activities of daily living with the reported severity of her symptoms. R. 30. Specifically, Campbell said that she was able to cook, clean, do laundry, shop if accompanied, and socialize with friends and family. R. 30; 666. During testimony, however, she said that she was typically confined to her bed or the couch. R. 60. Moreover, although additional treatment was recommended to Campbell, she chose not to pursue

21

such treatment.[8]  The ALJ explained that since her onset date, Campbell has been treated via psychotherapy and medication, but she has not pursued "neurological, psychiatric, or neuropsychiatric follow up despite recommendations to engage in such care."  R. 32; 464; 638; 640-41; 644-45.  The ALJ considered this evidence, and reasonably concluded that Campbell's syncope was not as severe as Campbell represented.  R. 27.

Campbell's argument that the ALJ erred by failing to consider objective evidence corroborating the severity of her symptoms also fails.  Campbell cites to a diagnosis by Dr. Perez of "syncope with differential including vasovagal episode versus psychogenic or cardiac dysrhythmia versus seizure," and an opinion from Dr. Myers that Campbell's syncope was due to episodic atrioventricular junctional rhythm.  Doc. 10, at 14-15; R. 494-504.  As the Commissioner notes, however, Dr. Perez's initial diagnosis and Dr. Myers's assessment well predate the onset date.  Doc. 11, at 14.  Additionally, Dr. Perez's diagnosis was a differential diagnosis that required numerous follow-up tests, which ultimately ruled out a physical cause for her syncope.  Id. at 14-15; R. 464; 503.  Similarly, Dr. Myers acknowledged that Campbell's syncopal episodes were anxiety-related and referred her to neuropsychiatry.  R. 27; 464.  The ALJ considered this evidence, and reasonably concluded that Campbell's syncope was anxiety-related and not as severe as Campbell represented.  R. 27.

Despite the ALJ's finding that Campbell's symptoms were not as severe as she alleged, the ALJ accounted for Campbell's syncope symptoms in her RFC.  R. 32-35.  The ALJ included

---

[8] Failure to follow physician's recommendations may suggest that the symptoms are not as severe as a claimant maintains.  See Robinson v. Berryhill, No. 14-1916, 2018 U.S. Dist. LEXIS 225242, at *13 (E.D. Pa. Oct. 23, 2018) ("[L]ack of follow up in general to her physicians' recommendations is notable as reflective of a failure to follow prescribed treatment and suggests that the symptoms are not as persistent as represented.").

Campbell's risk of syncope and collapse in her physical limitations by restricting Campbell to "occasional climbing of ramps and stairs; never climb ladders, ropes, or scaffolds; and should have no exposure to driving vehicles, unprotected heights and moving machinery." R. 33. Because Campbell's syncope is exacerbated by stress, the ALJ also restricted Campbell to unskilled work with reduced interaction, only occasional decision-making and occasional changes, and tasks performed at a consistent but not production pace. R. 32. For these reasons, the ALJ's RFC determination is supported by substantial evidence in the record.

**C. The ALJ did not err in her hypothetical questions to the VE.**

Finally, Campbell argues that the ALJ failed to include all of her credibly established limitations regarding her syncopal episodes in her RFC and hypothetical questions to the VE. Doc. 10, at 17. She points out that when such limitations were included in an alternative hypothetical, the VE testified that no work could be performed. Id.

Here, as previously noted, the ALJ did not adopt Dr. Beaumont's limitations related to her syncopal episodes because the ALJ determined that Dr. Beaumont's opinion was not supported nor consistent with the record. R. 32, 34. Because the ALJ rejected Dr. Beaumont's limitations as unpersuasive, the ALJ was permitted to exclude those limitations from the RFC and in the hypothetical questions to the VE. See Salles, 229 F. App'x at 148 ("A lack of evidentiary support in the medical record is a legitimate reason for excluding claimed limitations from the RFC.") The ALJ crafted an appropriate RFC based on the medical evidence and determined Campbell was not disabled. Therefore, Campbell's argument that the ALJ erred as to the hypothetical questions to the VE lacks merit.

VI.     **CONCLUSION**

Substantial evidence supports the ALJ's decision to reject Dr. Beaumont's opinion.  The

ALJ's decision discounting the severity of Campbell's syncope is also supported by substantial

evidence.  Finally, the ALJ did not err by excluding Dr. Beaumont's limitations from Campbell's

RFC and in the hypothetical questions posed to the VE.  Accordingly, Campbell's request for

review (Doc. 1) is **DENIED**.  The final decision of the Commissioner of Social Security is

**AFFIRMED**.

An appropriate order follows.


BY THE COURT:

/s/ Craig M. Straw
CRAIG M. STRAW
U.S. Magistrate Judge